**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-cr-364 (APM)** |
| **v.** | : | |
| | : | |
| **RICHARD ESCALERA,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Richard Escalera to 21 days' incarceration, followed by a 36-month term of probation, 60 hours of community service, and $500 in restitution.

## I.     Introduction

Defendant Richard Escalera, a 48-year-old sales representative, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Escalera pleaded guilty to one count of violating 40 U.S.C. § 5104(E)(2)(G). As explained herein, a sentence of incarceration is appropriate in this case because Escalera: (1) planned for violence on January 6; (2) ignored fencing and "AREA CLOSED" signs, witnessed violence against the police, and was sprayed with OC spray but still entered the U.S. Capitol Building; (3) was inside the U.S. Capitol building for at least 40 minutes, during which time he resisted the efforts of police officers to remove him from the building; and (4) made statements after January 6 celebrating his unlawful conduct.

On January 6, 2021, Escalera made his way to the front of the dense mob forming on the West Front of the U.S. Capitol Building. By that time - approximately 2:30 p.m. - rioters were using violence against the police, tearing down bike racks and pushing to get inside the building. Escalera stood at one of the police barricades in front of the southwest stairs and recorded video on his camcorder. During this time, Escalera was also pepper sprayed by the police. Despite these obvious signs of an ongoing riot, Escalera followed the police after they retreated up the stairs and ultimately entered the U.S. Capitol Building through the Upper West Terrace Doors at 2:44 p.m. Escalera then walked to the Rotunda where he joined a large crowd. Several minutes later, police entered the Rotunda, formed a police line and began to move rioters out of the room. Escalera resisted the police's efforts to clear the Rotunda and was one of the last rioters to be moved out of the area. In total, Escalera spent at least approximately 40 minutes inside the U.S. Capitol Building on January 6.

The Court must also consider that Escalera's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Escalera's crime support a sentence

of 21 days' incarceration, followed by a 36-month term of probation, 60 hours of community service, and $500 in restitution.

## II.    Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 27 (Statement of Offense), at 1-3.

*Defendant Escalera's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Richard Escalera traveled to Washington, D.C. from Destin, Florida. Escalera stayed the night in a hotel in the Washington, D.C. area that evening.  Early on the morning of January 6, Escalera packed a backpack with a number of items, including water, fruit, phone and camcorder chargers, and a stun gun and mace, and went to the Ellipse to attend the Stop the Steal rally. Escalera recorded multiple videos on his camcorder depicting the area around the Ellipse before the sun rose. In one video, Escalera zoomed in on the U.S. Capitol Building and said, "There's the U.S. Capitol. Where I think we need to be. Because that's where they're doin' it all at." *See* Exhibit A at timestamp 2:30. Escalera remained at the Ellipse until after former president Trump's speech. Then he marched with the crowd to the U.S. Capitol Building. As he approached U.S. Capitol grounds, Escalera encountered numerous fences affixed with "AREA CLOSED" signs, which he filmed with his camcorder.



*Image 1: Screenshot from Exhibit B, video from Escalera's camcorder, at timestamp 00:09*

But Escalera ignored these obvious signs and crossed onto Capitol grounds where he made his way through the dense crowd to the police barricades on the West Front. Escalera then stood at a set of barricades in front of the southwest scaffolding and filmed the police who were guarding the Capitol. In one video he created the crowd around him called out "push" as rioters began to physically fight numerous police officers.



*Image 2: Screenshot from Exhibit C, video from Escalera's camcorder, at timestamp 00:06*

As the rioters around him fought police, the police attempted to control the crowd by deploying oleoresin capsicum ("OC") spray. Escalera was sprayed with the OC spray and temporarily retreated from the police line. *See* Exhibit C at timestamp 00:13. Escalera did not stop recording, however. Escalera walked back to the police barricade after he recovered from the effects of OC spray and continued to record the violence against the police. In fact, Escalera created four more videos at the police barricades on the West Front. Escalera filmed as the crowd chanted, "LET US IN!" and "STOP THE STEAL!" and as rioters near him told the police, "You need to let us in, take care of those traitors." *See* Exhibit D, beginning at timestamp 1:30. Escalera also zoomed in on the nametag of an MPD lieutenant standing in front of him defending the building. *See id.* At timestamp 2:40. Body-worn camera footage shows Escalera standing at the barricades at approximately this time - at 2:31 p.m. - as chaos erupted all around him and after the barricades that were in front of him had been pulled into the crowd.



*Image 3: Screenshot from body-worn camera footage depicting Escalera on the West Front*

Escalera continued to record video on his camcorder as the rioters attacked the police on the West Front, causing the police line to fall.



*Image 4: Screenshot from Exhibit E, video from Escalera's camcorder, at timestamp 1:30*

Throughout his recording, Escalera coughed and choked from the effects of OC spray and other chemical irritants. *See generally* Exhibit E. When the police began to call out to each other to fall back, Escalera continued to record video, and other rioters around him called out that the police were retreating. *Id.*  After the police retreated up the stairs of the Capitol Building, Escalera advanced. Within 15 minutes, Escalera made his way up to the Upper West Terrace and entered the U.S. Capitol through the Upper West Terrace Doors at approximately 2:44 p.m.



*Image 5: Screenshot of Exhibit F (CCTV) depicting*
*Escalera's entrance into the U.S. Capitol Building*

When he entered the building, a loud alarm was blaring overhead. After walking through the Upper West Terrace Doors, Escalera went up the stairs and into the Rotunda. Escalera walked around filming on his camcorder for approximately three minutes in the Rotunda before exiting through the north doorway at approximately 2:47 p.m. The government has been unable to

determine where Escalera went inside the Capitol Building during the next 14 minutes.[2] Escalera

reentered the Rotunda from the north doorway at approximately 3:01 p.m. Shortly thereafter,

dozens of uniformed police officers filed into the Rotunda and began to form a police line. Instead

of leaving when the police entered, Escalera remained in the crowd.

At approximately 3:03 p.m., more police officers arrived to reinforce the police line and

began to move in unison to push the rioters out. Still, Escalera did not turn and leave. Instead, he

stayed put in the middle of the crowd until the police officers reached him, then he resisted their

efforts to push him toward the door by standing in place or otherwise leaning back against them.

At one point, as police tried to move him out, Escalera used his phone to film himself with the

police behind him.[3]



*Image 6: Screenshot from Exhibit G (BWC) Depicting Escalera filming
himself as officers tried to evacuate him from the Rotunda*

---

[2] In his post-plea interview, as set out below, Escalera stated that he walked down a heavily
congested hallway, began to walk down some stairs, and then turned around.

[3] No videos were recovered from Escalera's phone or camcorder from inside the U.S. Capitol
building, despite body-worn camera and/or CCTV footage showing Escalera filming while inside.

At approximately 3:14 p.m., Escalera began vomiting on the floor. Officers pulled him to an open area and rendered aid, including rinsing Escalera's face, eyes and head with water. Officers then walked Escalera to the front of the crowd at the east doorway and pushed him through. Escalera walked out of the east doorway to the Rotunda at approximately 3:17 p.m. Escalera then stood against a wall near the Rotunda Doors until about 3:25 p.m., when he finally left the U.S. Capitol Building.

At approximately 7:09 p.m. on January 6, Escalera texted another individual and stated, "Loved every minute of it dude. Here's a before and after storming the Capitol today." Later in the conversation, Escalera said, "After they hosed me with one last blast of mace I was out of the Capitol washing my face off and a reporter asked me if [sic] it was worth it. I told his ass that it was worth every minute of it."

*Escalera's Pre-Arrest Interview with the FBI*

On October 14, 2021, Escalera gave a voluntary interview to the FBI. During the interview, Escalera admitted to attending the Stop the Steal rally and listening to former president Trump's speech. Escalera refused to answer the agents' questions about whether he traveled to the U.S. Capitol Building.

*Search of Escalera's Residence*

On January 21, 2022, FBI executed a search warrant at Escalera's residence in Destin, Florida. During the search, FBI located Escalera's camcorder and cell phone. FBI also seized clothing items consistent with those worn by Escalera on January 6, including a black Columbia men's jacket, a black Patagonia backpack, and a camouflage baseball hat with lettering that read, "LIONS NOT SHEEP." FBI located a number of videos depicting the U.S. Capitol grounds on Escalera's camcorder but did not locate any videos or photographs on Escalera's cellular phone.

*Escalera's Post-Plea Interview with the FBI*

On July 26, 2023, Escalera was interviewed pursuant to Section 3 of his plea agreement. During the interview, Escalera admitted that he had mace and a stun gun in his backpack while inside the U.S. Capitol Building. He also stated that en route to the U.S. Capitol Building, he walked over a few poles and a makeshift fence that had fallen over. Escalera stated that he and other rioters moved the fallen fence to the side to prevent people from tripping on it. Escalera also told the government that when he exited the Rotunda and was out of camera range for approximately 14 minutes, he walked down a hallway that was heavily congested with tear gas or OC spray. Escalera stated he walked until he reached a stairwell and he started to walk down it. As he walked, the tear gas and OC effects became stronger. At one point, he met a police officer who gave him some water. After that, Escalera turned around and walked back up to the second floor of the U.S. Capitol Building, down the same hallway and back into the Rotunda. Finally, Escalera told the government that he did not, in fact, speak with a reporter after exiting the U.S. Capitol Building as he claimed in his text message but was exaggerating to his friend.

*The Charges and Plea Agreement*

On October 20, 2022, the United States charged Escalera by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On October 21, 2022, law enforcement officers arrested him at his home in Destin, Florida. On November 10, 2022, the United States charged Escalera by a four-count Information with the same offenses. On April 6, 2023, pursuant to a plea agreement, Escalera pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). In his plea agreement, Escalera agreed to pay $500 in restitution to the Architect of the Capitol.

### III.     Statutory Penalties

Escalera now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Escalera faces up to six months of imprisonment and a fine of up to $5,000. Escalera must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 21 days' incarceration, followed by a 36-month term of probation, 60 hours of community service, and $500 in restitution.

#### A.  The Nature and Circumstances of the Offense

One of the most important factors in Escalera's case is his persistence in entering the Capitol Building despite the clear signs that a riot was taking place. Escalera encountered fencing and "AREA CLOSED" signs before he even stepped foot on Capitol grounds. Then, Escalera made his way through the dense mob to the police line on the West Plaza where he witnessed numerous acts of violence against the police and was sprayed with OC spray. Despite his obvious awareness that the crowd had devolved into a riot, Escalera did not turn around and leave. Instead, he persisted up two flights of stairs to the Upper West Terrace where he entered the building through the Upper West Terrace Doors while an alarm blared overhead. Escalera then went up to the second floor of the building, walked through the Rotunda, wandered around the second floor for 14 minutes, and returned to the Rotunda. When he got back to the Rotunda, police officers were beginning to file

11

in. Still, Escalera did not leave. Instead, he forced the police to physically push him out, finally leaving the building almost 45 minutes after he entered.

Another significant aggravator is that Escalera brought two weapons in the Capitol Building: a stun gun and mace. It put the officers trying to protect the building in great danger to be surrounded by rioters, like Escalera, who were concealing dangerous weapons in their bags or on their person. The fact that he brought these weapons also shows that Escalera traveled to Washington, D.C. ready for a fight. He also persisted in his pursuit of getting in the building with these weapons, despite – as set out above – the numerous clear signs that the protest had devolved into a violent riot. Obviously, his ability to enter the building without going through any security checks that would have otherwise stopped him, was yet another indication that he was not entering the building in some permissible way.

Escalera's messages after his entrance into the U.S. Capitol are also aggravating. His messages show that he did not feel any remorse for his actions that day but instead "loved every minute of it." In this context, it is clear that Escalera was not someone who went to the Capitol to protest and merely got swept up in the riot. He traveled to Washington, D.C. with weapons, he was prepared to fight and, when violence did erupt, he joined the mob and reveled in it. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration.

### B.  The History and Characteristics of Escalera

As set forth in the PSR, Escalera's criminal history consists of a misdemeanor conviction for Operating a Motor Vehicle Under the Influence of Alcohol or Drugs and traffic infractions. ECF 31 ¶¶ 27, 29-32. Escalera has five children, two from a previous marriage, one from a previous relationship, and two with his wife. ECF 31 ¶¶ 41-42. It is regrettable that he chose to

leave them behind and embark on a trip to Washington where he anticipated having to participate in armed conflict. At the time of his arrest, Escalera was employed in sales and reporting with Capitol City Produce.

Escalera's history is both mitigating and aggravating. Escalera's minor criminal history and strong familial support suggest he is at a lower risk of recidivism. However, his stable financial and familial background also indicate he had many choices other than to commit these crimes; he cannot argue that these were crimes of desperation.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol Building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

As set out above, Escalera was not someone who simply got caught up in the moment. He planned to use violence, bringing mace and a stun gun with him from Florida to Washington, D.C. And when the day was all over – after he had seen multiple instances of violence against the police – he told an acquaintance that he "loved every minute of it." Escalera was an active participant in the attack on our democracy and a term of incarceration will provide the specific deterrence needed to ensure he does not commit similar crimes in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."[4] Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).

The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been

accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The government has often recommended, and judges have imposed, periods of incarceration in cases where a defendant has observed violence or property destruction before entering the building, where a defendant has brought weapons with him into the building, and where a defendant has remained in the building for an extended amount of time. Defendants who brought weapons into the building posed a much higher danger and indicate some level of pre-planning. A defendant who observed violence and property damage has a higher level of culpability because he was fully aware of the wrongfulness of the crowd's actions and actively chose to join the mob anyway. Defendants who remained in the building for longer periods of time are similarly more culpable because the longer time they spent in the building further prevented the completion of the certification and prolonged the terror felt by the Congressmen and Congresswomen.

In *United States v. Sean David Watson*, 21-CR-422-APM, the defendant entered the U.S. Capitol through the Senate Wing Doors after witnessing other rioters push past police and go inside. Watson remained in the building for 35 minutes and made statements to others, including a reporter, that he was proud of his actions on January 6. Watson also deleted videos from his phone. Watson pleaded guilty to a violation of 40 U.S.C. § 5104(e)(2)(G) and this Court sentenced him to 24 months' probation to include 7 days' incarceration. Escalera's conduct was arguably worse than Watson's conduct, requiring a longer term of incarceration. Most notably, Escalera brought weapons with him inside the building.

In *United States v. Paul Von Bernewtiz*, 21-CR-307-CRC, the defendant was among the crowd who initially breached the barriers on the West Front. Von Bernewtiz entered the building despite observing flashbangs, experiencing the deployment of tear gas and witnessing violence against the police. Von Bernewtiz remained inside the Capitol building for approximately 14 minutes and minimized his involvement to the FBI in subsequent interviews. Von Bernewtiz pleaded guilty to a violation of 40 U.S.C. § 5104(e)(2)(G), and Judge Cooper sentenced him to one month of incarceration.

In *United States v. Janet Buhler*, 21-CR-510-CKK, the defendant heard flashbangs and saw smoke before she entered the U.S. Capitol building, where she remained for 28 minutes. Buhler also deleted videos and photos from inside the building. Buhler pleaded guilty to a violation of 40 U.S.C. § 5104(e)(2)(G), and Judge Kollar-Kotelly sentenced her to one month of incarceration, to be followed by 36 months' probation.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d

220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the

result that "different district courts may have distinct sentencing philosophies and may emphasize

and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its

own set of facts and circumstances regarding the offense and the offender." *United States v.*

*Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence

differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have

sentenced that defendant." *Id*. at 1095.[5]

---

[5] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization

## V.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Escalera must pay $500 in restitution, which reflects in part the role Escalera played in the riot on January 6.[7] Plea Agreement, ECF 26, at ¶ 11. As the plea

---

first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," and any offense "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Escalera's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* ECF 31, PSR ¶ 79.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 21 days' incarceration, followed by a 36-month term of probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his/her crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Kaitlin Klamann*
       KAITLIN KLAMANN
       Assistant United States Attorney
       601 D Street N.W.
       Washington, D.C. 20530
       IL Bar No. 6316768
       Kaitlin.klamann@usdoj.gov
       (202) 252-6778